'CITY FIRE INS. CO. (SEMMES v.). See Case No. 12,651.

CITY INS. CO. (ROTH v.). See Case No. 12,-084.

CITY INS. CO. (TROTT v.). See Case No. 14,189.

---

## Case No. 2,743.

### CITY NAT. BANK v. PADUCAH.

[2 Flip. 61; [1] 5 Cent. Law J. 347; 1 Thomp. Nat. Bank Cas. 300.]

Circuit Court, D. Kentucky. June 1, 1877.

TAXATION OF SHARES OF NATIONAL BANK ENJOINED — BANK A PROPER PARTY, WHEN — GROUNDS OF INJUNCTION IN SUCH CASES—RATE OF TAXATION OF NATIONAL BANK SHARES—DIFFERENCE OF TAXATION—RATES — DOUBLE TAXATION.

1. To a bill in equity a bank is a proper party complainant when it is sought to enjoin the collection of a tax upon its shares assessed against its stockholders, if it appear that the bank would be subjected to a multiplicity of suits and its business be interfered with, its stock be depreciated and its credit impaired.

2. An injunction may be had to stay the collection of a tax on personal property, if the enforcement of the tax would lead to a multiplicity of suits, or where the law authorizing the tax is invalid.

3. Where different rates of taxation are imposed under the laws of a state or municipal government upon different classes of moneyed capital, it is not lawful to tax the shares of national banks at the highest rate imposed upon any class, regardless of the proportion which that class bears to other classes; nor is it confined to the lowest rate upon any class. And where different rates of taxation are imposed upon different classes of moneyed capital the rate of taxation on national bank shares should not exceed the rate imposed upon shares in state banks.

4. The banking capital of Kentucky paid only fifty cents per share as a tax. One of the state banks was located in Paducah whose capital exceeded that of all the national banks there: *Held*, that an ordinance which imposed a tax of $1.05 per share nominally on all banks, but, from the payment of which the state banks had been adjudged exempt, was an unlawful discrimination against the national bank, and invalid.

5. Where other moneyed capital was also taxed $1.05, but a reduction of the whole amount of the owner's indebtedness was to be made before the assessment, and no such deduction was allowed where the capital consisted of national bank shares, the tax upon such shares was declared invalid.

6. It was further *held* that as the value of the real estate held by the bank was not deducted, it was subjected to double taxation, and the tax was invalid.

Bill filed against the city and tax collector of Paducah to enjoin the collection of a tax upon national bank shares. The legisla-

---

[1] [Reported by William Searcy Flippin, Esq., .and here reprinted by permission.]

ture in 1867 passed an act to tax the shares of national banks, but provided that the same should not exceed that upon state bank shares. The amount so assessed under the state law was fifty cents per share. This amount complainant had paid for years to the state on its shares.

The city of Paducah in 1871 levied a tax of $1.05 on all bank shares. This was under the provisions of an ordinance passed by its common council, deriving its authority from the amended charter. The tax applied to state as well as national banks, but the courts of Kentucky decided that as to the state banks the tax was invalid. This tax was assessed for the year 1875, and the books were in the collector's hands when this bill was filed.

C. S. Marshall, L. D. Husbands, J. W. Bloomfield, and Henry Burnett, for complainant.

J. Q. A. King, J. C. Gilbert, James Campbell, Jr., W. D. Greer, and E. W. Bagby, for defendants.

BROWN, Circuit Justice. Upon the threshold of this case, we are confronted with the objection that, inasmuch as the tax in question is laid upon the individual shareholders, the bill cannot be maintained in the name of the bank; that the suit is one which concerns the stockholders only, and that they are the only proper parties complainant. Though this question has been raised before the supreme court several times, it has never been directly passed upon. In Dows v. City of Chicago, 11 Wall. [78 U. S.] 108, the bill was filed by a stockholder simply upon the ground of the illegality of the tax. The bank itself filed a cross-bill, also alleging the illegality of the tax assessed on various grounds; and averring that if the share were permitted to be sold, irreparable injury would not only be done the shareholders, but also to the bank, which would be thereby subjected to great loss of standing, and other injury, for the redress of which the law afforded no remedy; and that such also would be the result if the bank paid the taxes, and was subject to suits by each of the shareholders by reason of so doing; and that in either event a multiplicity of suits would be rendered necessary to adjust the rights of the parties. A demurrer was interposed to both bills, and both were dismissed; the original bill because it was based solely upon the ground that the tax was illegal, and the cross-bill because it must share the fate of the original. The court intimated, however, that if the cross-bill had been an original bill, with like averment, it might have been sustained, to avoid a multiplicity of suits. The question appears to have been fully argued in Tappan v. Merchants' Nat. Bank, 19 Wall. [86 U. S.] 490, under an allegation in the bill similar to the one under consideration, and to have been ruled by the circuit court of northern Illinois in favor of

the jurisdiction. Union Nat. Bank v. Chicago [Case No. 14,374]. In the supreme court, the case went off on another point, and the court expressly declined to pass upon this question. The only case I have found in which the jurisdiction was denied is that of the First Nat. Bank of Hannibal v. Meredith, 44 Mo. 500, where, notwithstanding the taxes were assessed against the bank and sought to be collected by seizing and selling all the shares comprising the capital stock, the court declined to interfere on the ground that an injunction to restrain the collection of the tax was not the proper remedy, unless the sale of the property was accompanied by irreparable damage. Incidentally, the court remarked, that the plaintiff had no equity, for the reason that its property was not in jeopardy; that the bank, as a corporation, would lose nothing if the shares of its stockholders were sold, and that its shareholders, if any one, were entitled to relief. The point, however, does not seem to have been maturely considered, and, indeed, it is doubtful whether the petition in that case, charging as it did, not an impending multiplicity of suits, but that the sale of the shares, would greatly damage the bank, by impairing its credit and stability, and injuring the owners of the stock, by casting a cloud over the title and destroying its convertibility, made out a case for relief.

The bill under consideration alleges, and the evidence meets, substantially, the averment, that the city is threatening to sue the bank and each of its stockholders, in separate suits, and will, unless restrained, sue out attachments garnishing the bank and attaching the stock of the shareholders, involving the plaintiff in a great many petty suits; breaking down the business of the bank, depreciating its stock, bringing endless confusion on the ownership of the same, injuring the credit of the bank, putting a cloud upon the same, and doing it an irreparable injury. That if the bank pays these taxes, the stockholders will sue it, and in either event, a multiplicity of suits will result. Upon the whole, I think the bank is so far the trustee of the stockholders, and the custodian of the dividends that it is entitled to maintain the bill. It might be subjected to great annoyance by stockholders, who denied the legality of the tax, and gave the bank notice that it would pay it at the peril of being sued by them. It is certainly no hardship to permit the whole question to be litigated in a single action.

We assume in this connection that all the stockholders in this bank, each having the same ground for relief, and the same defense being applicable to all, might have united in a single bill without multifariousness. Cooley, Tax'n, 545. This being so, we see no objection to the bank maintaining a like bill as trustee for the entire body of stockholders. We should feel inclined to go to the limit of the law in sustaining a practice so convenient, and, so far as we can see, so unobjectionable.

It is also insisted that a remedy by injunction cannot be invoked in this case. While it is freely conceded that a court of equity has no general power to restrain the collection of taxes for any irregularity of assessment, or for overvaluation or unjust discrimination, and that to sustain a bill the case must be brought within some acknowledged head of equity jurisdiction, we think this exigency is met in either of the two following cases:

1. Where the enforcement of the tax would lead to a multiplicity of suits; or

2. Where the law authorizing the tax is itself invalid.

Upon the first ground the interference of a court of equity was held proper in Heywood v. City of Buffalo, 14 N. Y. 534, and in Dows v. City of Chicago, 11 Wall. [78 U. S.] 108, 111. The opinion in that case received the sanction of the supreme court of the United States. The second ground of interference was also recognized by the supreme court in the same case, approving Cook Co. v. Chicago, B. & Q. R. Co., 35 Ill. 465. In the case of Chicago, B. & Q. R. Co. v. Frary, 22 Ill. 34, speaking of exceptions to the general rule, that a court of equity will not interfere, it is observed, "Those exceptions are confined almost, if not entirely, to cases where the tax is unauthorized, or it is assessed upon property which is not subject to the tax. The case of Illinois Cent. R. Co. v. McLean Co., 17 Ill. 291, fell within the latter exception. The same rule is practically affirmed in Munson v. Minor, 22 Ill. 601, and Center & Warren Gravel Road Co. v. Black, 32 Ind. 471. In Warden v. Board of Sup'rs, 14 Wis. 618, an exception is mentioned of objections which go to the very groundwork of the tax assessed, so as to affect materially its principle and to show it must necessarily be illegal. "Where it appears that the established principle of taxation has been violated, and that actual injustice will ensue, or that the tax is levied for an unauthorized purpose, of course equity will interfere in proper cases, to prevent the wrong." See High, Inj. 195-200. Both of the reasons above given for the exercise of equity jurisdiction, are apparent in this case, and we think the complainant has not mischosen its remedy. While in a case of over-valuation, or unjust discrimination an appeal to the supervising officers might correct the error, they would have no power in a case like this to question the validity of the ordinance by virtue of which the tax was assessed.

Coming now to the vital point in this case, viz.: The validity of the legislation by which the tax in question was imposed, we find the general proposition firmly established, that banks organized under acts of congress are regarded as fiscal agents of the government and exempt from taxation, except as

congress may specially authorize it. McCulloch v. Maryland, 4 Wheat. [17 U. S.] 416; Weston v. City of Charleston, 2 Pet. [27 U. S.] 448; Farmers' Bank v. Dearing, 91 U. S. 34.

In the organization of national banks, congress has given a qualified authority for state taxation in the following section of the Revised Statutes:

Sec. 5219. "Nothing herein shall prevent all the shares in any association from being included in the valuation of the personal property of the owner or holder of such shares, in assessing taxes imposed by authority of the state within which the association is located; but the legislature of each state may determine and direct the manner and place of taxing all the shares of national banking associations, located within the state, subject only to the two restrictions, that the taxation shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state; and that the shares of any national banking association, owned by nonresidents of any state shall be taxed in the city or town where the bank is located and not elsewhere. Nothing herein shall be construed to exempt the real property of associations from either state, county or municipal taxes to the same extent, according to its value, as other real property is taxed."

While the section in question would not be open to construction if the entire moneyed capital of the state, in the hands of individuals, were taxed at a uniform rate, the interpretation to be put upon it, where different rates of taxation are imposed upon different classes of moneyed capital, is not free from doubt. Has the state a right to tax the shares of national banks at the highest rate imposed upon any class of moneyed capital, regardless of the proportion which that class bears to other classes? On the other hand, is it confined to the lowest rate imposed upon any class of moneyed capital, with like disregard of the relative amount of the different classes? The last question is answered directly, in the case of Hepburn v. School Directors, 23 Wall. [90 U. S.] 480, in which it was proved that mortgages, judgments, recognizances and moneys owing upon articles of agreement for the sale of real estate were exempt from taxation in a certain district, except for state purposes. This was held a partial exemption, and it is said it cannot be the intention of congress to exempt bank shares from taxation, because some moneyed capital was exempt. Suppose, however, there were in a certain district a very small amount of moneyed capital of one species and a very large amount of another; that the former was heavily taxed and the latter exempt altogether, would the municipality be authorized to tax the shares of national banks at the rate imposed upon the former? Suppose, for example, that state banks, exempted from

taxation, absorbed three-fourths of the "other moneyed capital" of a certain city, and the remaining one-fourth was heavily taxed, would it not be not only an unjust discrimination but a mere evasion, to tax the shares of national banks at the rate imposed upon the taxed quarter? These questions have never been definitely settled, but bearing in mind that the obvious intention of congress was to permit taxation, but to inhibit unjust discrimination, it would seem the answer would be easy. I regard the true construction to be this: That when by local legislation different rates are prescribed for different classes of moneyed capital, the rate imposed upon shares in national banks should approximate as closely as may be to the rate imposed upon other moneyed capital of the same or similar class, viz., shares of state banks. While this rule might be subject to qualifications in localities where the capital of state banks bore a very small proportion to other moneyed capital, and the exemption was intended as a bounty, I think it furnishes, as a general rule, a safe guide to the validity of the tax.

It is urged, however, that the course of legislation upon this subject repels the inference here drawn from the language of the section, and shows, affirmatively, that congress intended to permit the states to discriminate in favor of their own banks, by repealing a proviso inhibiting such discrimination, originally annexed to the section in question. The 41st section of the original act of 1864 (13 Stat. 112) provides that "nothing in this act shall be construed to prevent all the shares in any of the said associations, held by any person or body corporate from being included in the valuation of personal property of said person or corporation, in the assessment of taxes imposed by or under state authority, at the place where such bank is located, and not elsewhere; but not at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state: provided, that the tax so imposed under the laws of any state, upon the shares of any of the associations authorized by this act, shall not exceed the rate imposed upon the shares in any of the banks organized under authority of the state where such association is located: provided, also, that nothing in this act shall exempt the real estate of associations from either state, county or municipal taxes, to the same extent, according to its value, as other real estate is taxed." In 1868 a short act was passed (15 Stat. 34) not amending, but explanatory of the 41st section, entitled, "An act in relation to taxing shares in national banks." The language is as follows: "That the words 'place where such bank is located, and not elsewhere,' in section 41, etc., shall be construed and held to mean the state within which the bank is located, and the legislature of each state may determine and direct the manner and place

of taxing all the shares of national banks located within said state, subject to the restriction that the taxation shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state: and provided always, that the shares of any national bank owned by non-residents of any state, shall be taxed in the city or town where said bank is located, and not elsewhere." The intent of congress was manifest. A difference of opinion had arisen with regard to the meaning of the words "place where the bank is located," and in some states the assessing officers were taxing the shares in the town or city where the bank was located, notwithstanding that the owner lived in a different town or city in the same state. To define the meaning of these words was the sole object of the act of 1868. This is evident, not only from the language of the act itself, but is an actual fact—(though possibly it is not a legitimate argument here)—as appears from the remarks of the chairman of the committee which reported the bill. See Cong. Globe, 2d Sess., 40th Cong. p. 921. The two provisions in the original act were neither of them alluded to in the act of 1868, although out of abundant caution the words "the taxation shall not be at a greater rate than is assessed upon other moneyed capital" were repeated, and an entirely new proviso added, that the shares of non-residents should be taxed in the city where the bank was located. There is certainly no express repeal of the two provisos in the original act, and nothing from which an implication of repeal can arise. Were it not for the Revised Statutes, I should hold both the provisos in the act of 1864 to be still in force. I am aware that in the case of Lyonberger v. Rouse, 9 Wall. [76 U. S.] 468, Mr. Justice Davis indicates an opinion that under the act of 1868 the power of state taxation was subject only to the restriction that "the taxation shall not be at a greater rate than is assessed upon other moneyed capital;" but the point does not seem to have been argued, and was unnecessary to the decision of the case. In the revision, the second proviso, that the real estate of the bank should remain subject to taxation, is retained; while the first, limiting the tax expressly to the rate imposed upon the shares of state banks, was omitted. If there were anything in the act of 1868 which could be construed as a repeal of the first proviso, I see no reason why it should not operate also as a repeal of the second; but, as observed before. I think the two acts should have been construed harmoniously, and the restriction in the act of 1868 should not have been regarded as exclusive as those in the former act, while the omission of the first proviso in the Revised Statutes undoubtedly operates, under section 5596, as a repeal of such proviso; yet considering the manner in which the repeal was affected, I think no intent can

be inferred on the part of congress, thereby affirmatively to permit states to subject the shares of national banks to a greater rate of taxation than they impose upon state banks, if any such intent could ever arise from the repeal of a prohibitory clause. So far as the question arising in this case is concerned, section 5219 should be construed precisely as if no prior legislation on the same subject had been had.

The ordinance of Paducah nominally imposed a tax of $1.05 upon all banks within its limits, state as well as national, but as there is but one state bank in the city, viz., the Commercial Bank, which is exempt from taxation beyond fifty cents per share, and a possible tax of fifty cents on each hundred dollars of its contingent fund, which seems never to have been collected, the tax is really applicable only to the three national banks, the aggregate capital of which is less than the capital of the Commercial Bank. It is true an attempt was made to assess the same tax upon the Commercial Bank, but an injunction against its collection appears to have been granted and perpetuated by the state court. I feel authorized then, to treat it as exempt from this tax. That the Commercial Bank is not exceptionally favored in this particular, is shown by the certificate of the auditor of public accounts of the state, which is in evidence and exhibits a complete list of all banks doing business under the laws of Kentucky. They are fifty-three in number, having an aggregate capital of $12,473,641.50, and each pays the state a tax of fifty cents on every hundred dollars of its capital, in lieu of all other taxes, though there are slight variations in the different charters. If there are any state banks, the taxation of which is not regulated by their charters, they fall within the general provision of chapter 92, article 2, section 1, "on bank stock, or stock in any moneyed corporation of loan or discount, fifty cents on each share thereof, equal to one hundred dollars." The result is the same in either case, a few apparent exceptions being set forth in the answer; but practically the entire banking capital of the state is subject to a tax of fifty cents per share on one hundred dollars, in lieu of all other taxes. If the city of Paducah may tax national banks at $1.05 per share for the year 1875, it may increase the tax at any time to $2.50, the amount authorized by the legislature, and to as much greater an amount as the legislature may hereafter see fit to authorize. It was conceded upon the argument that the tax for 1877 had been increased to $1.40. Indeed, the legislature may authorize like taxation by every municipality in the state, while the state banks under their special charter will escape the burden altogether. Certainly here is a large discrimination in favor of state banks. I am not unmindful in this connection of the case of Lyonberger v. Rouse, above cited, nor of the case of Hepburn v.

School Directors, 23 Wall. [90 U. S.] 480, in which it was held that the exemption of small amounts of moneyed capital, in particular cases, would not invalidate the tax, if the great body of moneyed capital was subjected to it. In both these cases, however, the amount exempted was small in proportion to the aggregate amount of moneyed capital, and the great mass of moneyed property was subjected to the same tax levied upon the shares of national banks. It is true that the fifty-three state banks in Kentucky are not chartered by general law, but by special acts in each case; but this seems to me to make no difference. The fact remains that practically the entire banking capital of the state pays a tax of fifty cents in lieu of all other taxes, even upon its real estate. The law will look, not at the manner in which the tax is imposed, but at the result of the system. A like answer may be made to the argument that many of these state charters have expired, and that in renewing them the power to increase the taxation is reserved. This power never seems to have been exercised.

It is insisted, however, that although the legislation in question may discriminate in favor of state banks, there is no discrimination against national banks, inasmuch as "all other moneyed capital, in the hands of individuals," except shares in state banks, pays the same tax. Under the general laws of Kentucky (and the charter of Paducah adopts the same rule of assessment) property subject to taxation is listed in five classes: .

1. Real estate; 2, horses, mules and the like; 3, cattle; 4, watches, plate, clocks, pianos, vehicles and harnesses; 5, ."the assessor after having taken the lists of all property required to be taken listed as above, shall require each person on oath to fix the amount he or she is worth from all other sources on the day to which said list relates, after taking out his or her indebtedness from said amount; and the said assessor shall take from the said amount the sum of one hundred dollars, and list the balance for taxation." This section includes all property not exempt or previously mentioned, such as spirituous liquors, the produce of mines, farms, forests, manufactures, notes, accounts, bonds, bills of exchange and choses in action, debts and demands of every kind, but does not include bank stock. The whole amount of this fifth class, in which "other moneyed capital" is included, in the city of Paducah, is shown by the assessor's books to be in all $303,865. From this must be deducted all which is not moneyed capital. The residue, consisting of money on deposit, notes, bonds, mortgages, judgments and other choses in action, is the only "other moneyed capital," and the amount of this it is impossible to ascertain, as it is nowhere listed or taxed as such. A liberal estimate would probably not place it over $200,000. Upon this the tax of $1.05 is imposed, sub-

ject, however, to a deduction of all the indebtedness of the tax-payer. If, then, the property of the tax-payer consists of national bank stocks, purchased by him and for which he has given his note for the full amount, he pays, notwithstanding, the tax of $1.05 per share; but if his property consists of any other moneyed capital, and his debts are equal to the value of the capital, he pays nothing. It is true, exact uniformity can never be attained, but the law requires at least an approximation to it, else the proviso in the Revised Statutes is useless. While the tax is legal, if laid at the same "rate" as other moneyed capital is taxed, (and it may be said to be uniform if the rate is uniform,) yet uniformity of rate presupposes uniformity of valuation. If, for instance, state bank stocks were appraised at their par value and national bank stocks at their cash value, there would be no real uniformity of rates, though the percentage might be the same in both cases, since the cash value might be half or double the par value. This principle is recognized in Railroad Tax Cases, 92 U. S. 611, where the tax was sustained upon the ground that the rate imposed on railroad property was no greater than that upon other property, and the valuation was assessed upon the same principle which was applied to the property of individuals. Although by the term "moneyed capital" in section 2519, is meant taxable moneyed capital, yet this must be understood only as distinguishing a class of capital which is taxable from another, which, from motives of public policy, is exempt. All moneyed capital listed under the fifth subdivision of the equalization law belongs to the class of taxable moneyed capital, made the basis of comparison in section 2519; but if in the hands of "A." this capital is taxed, and in the hands of "B." it is not taxed, because he is in debt to its full value, like discrimination should be made if this capital consists of national bank stock, or the tax is not uniform. The legislature may discriminate among different classes of capital without violating the requirements of uniformity, yet as between individuals of the same class the burden must be laid equally. It cannot tax A. and exempt B., if the property is of the same class. Now the act of congress classifies national bank stock with other taxable moneyed capital, and inhibits discrimination against it and in favor of other moneyed capital. If a deduction of debts is allowed in one case, it should be in the other, or there is no uniformity.

Nor is this discrimination likely to work a hardship only in rare instances. Most business men, among whom bank stock is principally owned, are more or less indebted, and the system which permits the debts of one to be deducted and not those of another can hardly be said to be uniform. It is true the deduction of this indebtedness may be prac-

tically impossible so long as the shares of banks are listed under the equalization law above quoted; but this is an argument to show, not that the tax is uniform with that levied upon other moneyed capital; but that the rule announced earlier in this opinion, that the taxation of national banks should conform to that of state banks, is the only one under which taxation can be practically and uniformly imposed.

Another want of uniformity exists in the fact that no provision is made for the deduction of the value of real estate from the aggregate value of the shares. The laws of Ohio, and it is believed of other states, require the appraised value of the real estate to be deducted from the actual total value of the shares before they are listed for taxation. Without such provision, a double tax is paid upon the value of the real estate, from which other moneyed capital is exempt.

I lay no stress upon the deduction of one hundred dollars allowed by the equalization law, or upon the fact that shares owned by colored people may be taxed for the support of common schools in violation of the law applicable to other moneyed capital. These exemptions fall within the rule laid down in Hepburn v. School Directors, supra, and Everitt's Appeal, 71 Pa. St. 216, and do very little to disturb the practical uniformity of the law. De minimis non curat lex.

But from whatever point of view this case is considered, the fact is apparent, that by the ordinance of Paducah a large tax is imposed upon the shares of national banks, from which the banking capital of the state is wholly exempt; and though the percentage is nominally the same, the tax is far more onerous than that laid upon other moneyed capital in the city. For these reasons, it seems to me the legislation is in conflict with the act of congress, and therefore invalid.

A decree will be entered perpetuating the injunction.